**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

CHARLES C. HARDEN D/B/A CLOVERGRASS PRODUCE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NUTRIEN LTD.; NUTRIEN AG SOLUTIONS; THE MOSAIC CO.; MOSAIC FERTILIZER, LLC; MOSAIC CANADA CROP NUTRITION, LP; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES, INC.; CF INDUSTRIES NITROGEN, LLC; KOCH INDUSTRIES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER WEVER, LLC; KOCH AGRONOMIC SERVICES, LLC; KOCH FERTILIZER, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; CANPOTEX LTD.; INTERNATIONAL FERTILIZER ASSOCIATION; AND THE FERTILIZER INSTITUTE,

Defendants.

Case No. 6:26-cv-1220

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I. SUMMARY ....1

II. JURISDICTION AND VENUE ....6

III. PARTIES ....7

A. Plaintiff ....7

B. Defendants ....7

C. Agents and Co-Conspirators ....12

IV. FACTUAL ALLEGATIONS ....13

A. NPK Fertilizer ....13

B. NPK Fertilizer Market Concentration ....16

C. Defendants' Conspiracy is Evidenced by Lockstep Price Increases for NPK Fertilizer and Significant Profit Increases for the Manufacturer Defendants not Indicated by Market Conditions ....19

D. Defendants also Coordinated Reductions in Production to Maintain High Prices. ....26

E. Other Factors Indicate Existence of a Conspiracy in the NPK Fertilizer Market ....27

V. RELEVANT ANTITRUST MARKET ....35

VI. FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ....36

VII. ANTITRUST INJURY AND DAMAGES ....37

VIII. ANTITRUST INJURY ....38

IX. CLASS ACTION ALLEGATIONS ....40

X. CLAIM FOR RELIEF ....44

XI. REQUEST FOR RELIEF ....46

XII. DEMAND FOR JURY TRIAL ....48

XIII. DESIGNATION OF PLACE OF TRIAL ....48

Plaintiff Charles C. Harden d/b/a Clovergrass Produce ("Plaintiff") brings this action individually and on behalf of all other similarly situated direct purchasers against Defendants. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges as follows based on personal knowledge as to the facts pertaining to himself, and on information and belief as to all other matters, based on the investigation of his counsel.

## I. SUMMARY

1. Plaintiff brings this suit against Defendants for their unlawful agreement to fix and raise the price of fertilizer containing one or more of the ingredients nitrogen, phosphate, and/or potassium (potash) (collectively, "NPK Fertilizer") in the United States from January 1, 2020 to the present. Nearly all fertilizers used for commercial agriculture in the United States include one or more of those components.

2. Defendants in this action are the dominant producers, manufacturers, and sellers of NPK Fertilizer in the United States – Nutrien Ltd. ("Nutrien"); Nutrien Ag Solutions ("Nutrien Ag"); The Mosaic Co. ("Mosaic"); Mosaic Fertilizer, LLC ("Mosaic Fertilizer"); Mosaic Canada Crop Nutrition, LP; CF Industries Holdings, Inc.; CF Industries, Inc. ("CF Industries"); CF Industries Nitrogen, LLC; Koch Industries, LLC ("Koch"); Koch Ag & Energy Solutions, LLC ("KAES"); Koch Agronomics Services, LLC ("KAS"); Koch Fertilizer, LLC ("Koch Fertilizer"); Koch Fertilizer Wever, LLC ("Koch Wever"); Yara International ASA ("Yara"); Yara North America, Inc. ("Yara NA"); Canpotex Ltd. ("Canpotex,") and all of the above, collectively, "Manufacturer

Defendants" – as well as global fertilizer association International Fertilizer Association ("IFA") and trade association The Fertilizer Institute ("TFI"). The Manufacturer Defendants, IFA, and TFI will be referred to collectively as "Defendants".

3. The Manufacturer Defendants have used their collective market power to unlawfully suppress the supply of, and artificially raise and fix prices of, NPK Fertilizer in the United States.

4. From at least January 1, 2020 and continuing through the present, Defendants colluded to artificially fix and raise prices of NPK Fertilizer in the United States, causing the price of NPK Fertilizer in the United States to rise to supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Class paying supracompetitive prices for NPK Fertilizer in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

5. Defendants' conspiracy has enabled the Manufacturer Defendants to receive supracompetitive profit margins from inflating the price of fertilizer beyond what actual market conditions would allow. The Manufacturer Defendants are able to charge supracompetitive prices without (1) losing market share to other Manufacturer Defendants, because they collusively agree to restrict supply and keep prices high and not undercut one another, and (2) losing market share to new market entrants, because high barriers to entry effectively prevent new competitors from entering the United States market for NPK Fertilizer.

6. In March 2022, the price of NPK Fertilizers in the United States reached all-time highs. While market conditions at the time would have indicated some degree of increase due to factors such as Russia's invasion of Ukraine and the still-ongoing Covid pandemic, the Manufacturer Defendants used this period of global disruption as pretext to inflate NPK Fertilizer prices far beyond what market conditions would permit, with no intention of returning to a market-dependent pricing scheme.

7. From 2022 to 2024, U.S. net farm income decreased by nearly 23%. Nevertheless, the Manufacturer Defendants' profits continued to remain high and NPK Fertilizer prices remain abnormally high by historical standards.

8. The Department of Justice[1] and the Federal Trade Commission[2] have launched investigations of Defendants' actions in the NPK Fertilizer market.

9. On September 26, 2025, the Department of Justice's Antitrust Division and the Department of Agriculture (USDA) signed a memorandum of understanding ("MOU") that formalized a partnership between the agencies to protect competition in key agricultural input markets, including fertilizer.[3] The MOU emphasized the agencies'

---

[1] *U.S. Department of Justice Opens Investigations into U.S. Fertilizer Market*, Crop Life (Mar. 19, 2026), https://www.croplife.com/crop-inputs/u-s-department-of-justice-opens-investigations-into-u-s-fertilizer-market/

[2] Morgan, Tyne. *FTC Launches Formal Investigation into Fertilizer Industry as Farmers Say They're 'Fed Up'* (May 28, 2026), https://www.agweb.com/news/policy/politics/ftc-launches-formal-investigation-fertilizer-industry-farmers-say-theyre-fed

[3] *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs*, Off. of Pub. Affs. - Dep't of Just. (Sept. 29, 2025), https://www.justice.gov/opa/pr/justice-department-and-usda-coordinate-protect-competition-agricultural-inputs

commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[4]

10. On October 28, 2025, the U.S. Senate Judiciary Committee conducted a hearing on the issue entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries."[5] This hearing featured U.S. farmers, seed manufacturers, industry scholars, and TFI, a Defendant in this action, seeking solutions on how to curb the rising input costs that farmers face today. Farmers and researchers alike cited massive consolidation in the fertilizer and seed industries as the reason why agricultural input costs, including costs of NPK Fertilizer, have reached an unsustainable level.

11. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[6]

---

[4] *Memorandum of Understanding Between the Antitrust Division, Department of Justice and the Department of Agriculture Relative to Cooperation with Respect to Strengthening Competition for Agricultural Inputs*, Off. of Pub. Affs. - Dep't of Just. 1 (Sept. 26, 2025), https://www.justice.gov/atr/media/1415501/dl?inline

[5] *Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries*, Sen. Jud. Comm. (Oct. 28, 2025), https://www.judiciary.senate.gov/committee-activity/hearings/pressure-cooker-competition-issues-in-the-seed-and-fertilizer-industries

[6] *Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain*, The White House (Dec. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain

12. On January 21, 2026, in a webinar with the National Agricultural Law Center, USDA Deputy Secretary Stephen Vaden warned: "[A]ntitrust laws exist for a reason, and that reason is because when an industry gets too concentrated, that is to say there are too few people competing, bad things can happen that undermine free enterprise. And there are signs that that may be happening in American agriculture."[7] The signs of antitrust violations presently occurring in American agriculture include "the duopoly that is Mosaic and Nutrien and their successful efforts over the past several years to constrain fertilizer supply in this country and drive up the costs that farmers are paying."[8]

13. In February 2026, both the Iowa Corn Growers Association and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice is doing to pursue possible antitrust actions against the fertilizer industry. The letters reflected farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.

14. On March 4, 2026, Bloomberg reported that the Department of Justice has begun investigating the U.S. Fertilizer Market for possible price fixing, including multiple Manufacturer Defendants' practices.[9] The Bloomberg report specifically stated that the

[7] *A Conversation with USDA Deputy Secretary Stephen Vaden: Update on Ag Trade, Financial Assistance, USDA Reorganization & Related Issues*, The Nat'l Agric. Law Ctr. (Jan. 21, 2026), https://nationalaglawcenter.org/webinars/vaden

[8] *Id*.

[9] *DOJ Probes U.S. Fertilizer Market for Possible Price Fixing*, Bloomberg (Mar. 4, 2026), https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing

investigation is looking at whether Manufacturer Defendants CF Industries, Koch Inc., Mosaic, Nutrien and Yara International colluded to raise prices for nitrogen, phosphate and potash fertilizers.

15. To remedy Defendants' conspiracy and illegal actions described in this Complaint, Plaintiff brings this case on behalf of direct purchasers of NPK Fertilizer, seeking, among other relief, damages for the overcharges direct purchasers have paid to the Manufacturer Defendants.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. This Court also has jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17. This Court has personal jurisdiction over Defendants because they transacted business throughout the United States, including in this District, and have purposefully directed their activities at this District. Defendants have sold NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, including in this District, and have derived substantial revenue from those sales.

18. Defendants' conduct, as alleged herein, was directed at and had a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants' activities substantially affected interstate trade and commerce throughout the United States, including in this District.

19. Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1391(b) and (c), because one or more Defendants resided, transacted business, were found, or had agents in this District, and because all Defendants would be subject to personal jurisdiction in this District.

20. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class consists of more than 100 members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class is a citizen of a state different from at least one Defendant.

## III. PARTIES

### A. Plaintiff

21. Plaintiff Charles C. Harden operates a farm in Windsor, NC d/b/a Clovergrass Produce, and purchased NPK Fertilizer directly from one or more of the Manufacturer Defendants during the Class Period. Plaintiff's purchases were made at prices artificially inflated by Defendants or their co-conspirators through the conduct alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B. Defendants

22. Defendant Nutrien Ltd. is a Canadian company based in Saskatoon, Saskatchewan, Canada. Nutrien is the world's largest upstream fertilizer producer, also with extensive midstream distribution capability. Nutrien has four major divisions: Nitrogen, Phosphate, Potash, and its retail division Nutrien Ag Solutions.

23. Defendant Nutrien Ag Solutions, Inc. is a Delaware corporation based in Loveland, CO, and is the wholly owned subsidiary of Nutrien Ltd. Nutrien Ag Solutions operates retail stores on behalf of Nutrien. Unless otherwise specified, references to "Nutrien" herein encompass Nutrien Ltd. and Nutrien Ag Solutions, Inc.

24. Defendant The Mosaic Company is a Delaware corporation based in Tampa, FL. Mosaic is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizer.

25. Defendant Mosaic Fertilizer, LLC is a Delaware LLC based in Tampa, FL and is a wholly-owned subsidiary of Mosaic that produces fertilizer.

26. Defendant Mosaic Canada Crop Nutrition, LP is a wholly-owned subsidiary of The Mosaic Company that is organized and existing under the laws of Canada, with its principal place of business in Regina, Saskatchewan. Mosaic Canada Crop Nutrition, LP mines potash in Canada to produce fertilizer that is exported to the United States. Mosaic Canada Crop Nutrition, LP is a 50% shareholder in Canpotex Limited, with Nutrien Ltd. holding the other 50%. Unless otherwise specified, references to "Mosaic" herein encompass The Mosaic Company, Mosaic Fertilizer, LLC, and Mosaic Canada Crop Nutrition, LP.

27. Defendant CF Industries Holdings, Inc. is a Delaware corporation and the parent company of CF Industries, Inc.

28. Defendant CF Industries, Inc. is a Delaware corporation based in Northbrook, IL. CF Industries produces nitrogen-based NPK Fertilizer for sale throughout the United States.

29. Defendant CF Industries Nitrogen, LLC is a Delaware limited liability company and wholly-owned subsidiary of CF Industries Holdings, Inc. with its principal place of business in Northbrook, IL. CF Industries Nitrogen, LLC is a leading producer of nitrogen fertilizers in the United States. CF Industries Nitrogen, LLC operates major nitrogen complexes in Donaldsonville, Louisiana; Sergeant Bluff, Iowa; Claremore, Oklahoma; Yazoo City, Mississippi; Woodward, Oklahoma; Waggaman, Louisiana and other domestic locations. Unless otherwise specified, references to "CF Industries" herein encompass CF Industries Holdings, CF Industries, Inc., and CF Industries Nitrogen, LLC.

30. Defendant Koch Industries, LLC ("Koch") is a Kansas limited liability company based in Wichita, KS.

31. Defendant Koch Ag & Energy Solutions ("KAES") is a wholly owned subsidiary of Koch based in Wichita, KS. KAES consists of Koch Fertilizer, Koch Energy Services, Koch Methanol, and Koch Agronomics Services, LLC.

32. Defendant Koch Agronomics Services, LLC ("KAS") is a wholly owned subsidiary of Koch based in Wichita, KS. KAS is a leading manufacturer of nitrogen-based NPK Fertilizer throughout the United States.

33. Defendant Koch Fertilizer, LLC is a wholly owned subsidiary of Koch based in Wichita, KS. Koch Fertilizer and its affiliates are collectively one of the world's largest producers and marketers of fertilizers, with a product portfolio that includes ammonia, urea, UAN (urea ammonium nitrate, a nitrogen-based fertilizer), phosphate, potash, and sulfur-based products.

34. Defendant Koch Fertilizer Wever, LLC ("Koch Wever") is a wholly owned subsidiary of Koch. Koch Wever is based in Wichita, KS and operates a nitrogen fertilizer plant located in Wever, IA. Koch Wever, formerly Iowa Fertilizer Company LLC, opened in 2017 and was wholly owned by OCI N.V. until 2023. On December 18, 2023, OCI N.V. and KAES entered into a $3.6 billion agreement for the sale of Iowa Fertilizer Company to KAES (the "Wever Acquisition"). The divestment was successfully completed on or before August 29, 2024. The Wever Acquisition led to an increase in the total market share of the nitrogen fertilizer market held by Defendants Nutrien, CF Industries, and Koch., as is illustrated by the figure below ($NH_3$ is the chemical name for ammonia).




35. Defendant Yara International ASA ("Yara") is a Norwegian company based in Oslo, Norway. Yara is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizer, and through its North American subsidiary Yara NA, Yara sells NPK Fertilizer in the United States.

36. Defendant Yara North America, Inc. ("Yara NA") is a wholly-owned subsidiary of Yara based in Tampa, FL. Yara NA sells nitrogen-based fertilizer and NPK Fertilizers in the United States.

37. Defendant Canpotex Ltd. is a Canadian company based in Saskatoon, Saskatchewan, Canada. Canpotex is a joint venture that is wholly-owned by Mosaic and Nutrien, each with a 50% share. Canpotex is one of the world's largest potash exporters.

38. Defendant International Fertilizer Association ("IFA") is a global fertilizer association incorporated and registered in the United Kingdom, with a principal place of business in Paris, France.

39. IFA is the only global fertilizer association, with around 500 members in some 80 countries and a mission to promote the efficient and responsible production, distribution and use of plant nutrients. Members include fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations. IFA Members decide together on areas of common interest, joint actions, and positions on emerging and complex issues facing the fertilizer industry. IFA membership benefits include industry events and access to an industry data sharing platform, IFASTAT, which IFA boasts is a source for the most comprehensive statistical information on fertilizer and raw material supply and fertilizer consumption.

40. Nearly all Defendants named in this Complaint are members of IFA, including Defendants Nutrien, Nutrien Ag, Mosaic, Mosaic Fertilizer, CF Industries, KAES, KAS, Koch Fertilizer, Yara, Yara NA, Canpotex, and TFI. Some of the Manufacturer Defendants' executives currently sit on IFA's board of directors.

41. At all relevant times, IFA was an active participant in the conspiracy to limit the supply and fix, raise, maintain, or stabilize fertilizer prices in the United States. At all

relevant times, IFA acted as a co-conspirator of Manufacturer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

42. Defendant The Fertilizer Institute ("TFI") is a trade association for the fertilizer industry and is based in Arlington, VA. TFI is a membership association that partners with fertilizer producers, wholesalers, retailers, and the businesses that serve them and markets itself as the leading voice of the fertilizer industry. TFI encourages membership for access to information and data as well as professional connections. Members include Manufacturer Defendants Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic. Some of the Manufacturer Defendants' executives currently sit on TFI's board of directors.

43. At all relevant times, TFI was an active participant in the conspiracy to limit the supply and fix, raise, maintain, or stabilize fertilizer prices in the United States. At all relevant times, TFI acted as a co-conspirator of Manufacturer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

### C. Agents and Co-Conspirators

44. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively

engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

45. Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of NPK Fertilizer. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

## IV. FACTUAL ALLEGATIONS

### A. NPK Fertilizer

46. Modern agricultural crops benefit from three essential macronutrients: nitrogen, phosphorus, and potassium (labeled "N", "P", and "K", respectively, after the elemental symbols for those nutrients). These nutrients are supplied to crops through NPK Fertilizer. Each nutrient plays a different role in plant growth, and so they are combined to form the basis of most fertilizer systems used around the world and in the United States.

47. NPK Fertilizer is applied both as individual nutrients or as blended formulations depending on crop and soil requirements. Farmers use single-nutrient products when a specific nutrient is needed in isolation, but other times use blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions, such as "12-

8-4”, meaning 12% of the weight of the fertilizer is nitrogen, 8% is phosphorus, and 4% is potassium.

48. In 2025, U.S. fertilizer sales were approximately $30 billion. Nearly all of that was for NPK Fertilizers.

***Nitrogen Fertilizers***

49. Nitrogen fertilizers are the most commonly used fertilizers in American agriculture, representing approximately 59% by volume of total fertilizer use. Nitrogen is a key part of chlorophyll, the pigment molecule in plants that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

50. Roughly half of global food production depends on synthetic nitrogen fertilizer. Without a consistent supply of synthetic nitrogen fertilizer, global food production would be at risk.

51. Today, most nitrogen fertilizers originate from industrial anhydrous ammonia, which is synthesized using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

52. Common nitrogen fertilizers include urea, ammonium nitrate, ammonium sulfate, and urea ammonium nitrate (UAN) solution. These fertilizers vary in nitrogen

concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

53. Defendants CF Industries, Nutrien, Koch, and Yara-USA collectively account for approximately 80 percent of the U.S. market share for Nitrogen Fertilizers. As of 2024, Defendant CF Industries is the largest, with 39 percent of the market, while Nutrien holds 22 percent, Koch holds 15 percent, and Yara holds 6 percent.

***Phosphorus Fertilizers***

54. Phosphorus fertilizers represent approximately 19% by volume of American fertilizer use.

55. Phosphorous is essential to plants' conversion of sunlight into energy. Phosphorous also supports photosynthesis, energy transfer, root development, flower and seed formation, cell division, cell enlargement, and the transfer of genetic information. It is a key component of the generic molecule DNA and the energy transfer molecule ATP. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

56. Phosphorus-based fertilizers come from phosphate rock, a naturally occurring mineral mined from geologic deposits. The rock is treated with sulfuric acid to release phosphorus and produce phosphoric acid. When combined with ammonia and other chemicals, phosphoric acid can create various liquid and dry fertilizer products, including monoammonium phosphate (MAP), diammonium phosphate (DAP), and triple superphosphate (TSP).

57. Mosaic, Nutrien, Koch, and Yara each produce phosphate, and Mosaic and Nutrien dominate the sector. Mosaic has the largest global production capacity for phosphate fertilizers, with its North American output exceeding the aggregate capacity of its three nearest competitors.

***Potassium Fertilizers***

58. Potash fertilizers account for approximately 22% of total United States fertilizer consumption by volume.

59. Plants need potassium to help regulate water movement within plant tissues, activate enzymes involved in metabolism, support plant tolerance to environmental stresses such as drought or disease, and improve yield and quality. When plants have adequate potassium, they are healthier, more resilient, and more productive.

60. Potassium-based fertilizers originate from potassium chloride, also known as potash. Potash is mined from geological deposits of evaporite minerals, which were formed when ancient seas and saltwater lakes evaporated millions of years ago, leaving behind layers rich in potassium salts. After potash is mined, it is refined into different fertilizer products—including potassium chloride and potassium sulfate—and shaped into small, uniform granules so farmers can apply it easily and plants can absorb the nutrients more efficiently.

61. Nutrien and Mosaic dominate North American potash production, controlling nearly all production capacity.

**B. NPK Fertilizer Market Concentration**

62. NPK Fertilizer is favored over other fertilizers because it supplies the three macronutrients that crops need in the largest amounts, and it is highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizer provides precise nutrient content, is easy to store and transport, releases nutrients more quickly into the soil, and is adaptable to most major crops and soil types, making it the primary choice for high-yield, modern agriculture.

63. The NPK Fertilizer industry has experienced dramatic consolidation since at least the late-1970s, transforming from a competitive market into a highly concentrated market dominated by the Manufacturer Defendants.

64. As of 1990, there were approximately 30 companies in the nitrogen fertilizer market, 15 companies in the phosphorous fertilizer market, and eight companies in the potassium fertilizer market.

58. As of 2022, only 13 companies remained in the nitrogen market, with Manufacturer Defendants controlling 75% of the market.

59. As of 2024, the Manufacturer Defendants control at least 82% of the nitrogen fertilizer market, 90 to 95% of the potash fertilizer market, and 91% of the phosphate fertilizer market in North America.

60. The NPK Fertilizer industry is dominated by three companies in particular. Mosaic and Nutrien control over 90% of the American market for phosphate and potash, while CF Industries is the largest company in the nitrogen sector, in which Nutrien is also a major producer.

61. Market concentration in the NPK Fertilizer industry can be measured by the Herfindahl-Hirschman Index ("HHI"), a calculation that assigns a number from 0 to 10,000 to an industry to quantify competition levels. HHI is calculated by taking the market share in percentage of each company in the industry, squaring each number, and summing up the squares. The higher the HHI, the less competition exists in the industry. Scores ranging from 1,800 to 2,500 indicate high concentration in a given industry, and a score above 2,500 suggests the possibility of an oligopoly or monopoly in that industry. The NPK Fertilizer market shows extremely high levels of concentration in the United States:



**HHI Measures for Fertilizers by Geographic Scope by Year**

### C. Defendants' Conspiracy is Evidenced by Lockstep Price Increases for NPK Fertilizer and Significant Profit Increases for the Manufacturer Defendants not Indicated by Market Conditions

62. Since 2020, publicly available pricing disclosures show a strong parallel pattern in the price of NPK Fertilizer: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present. The

following graphs charting the Producer Price Indices (PPIs) for NPK fertilizers demonstrates the lockstep price movements of these products.

**Producer Price Index for Fertilizers (Last 10 Years)**




**Producer Price Index for Nitrogen Fertilizers (Last 10 Years)**



**Producer Price Index for Phosphorous Fertilizers (Last 10 Years)**




**Producer Price Index for Potash (2018–2022)**




63. Specifically, as to nitrogen fertilizers, prices spiked in 2021-2022. By December 2021, the USDA estimated year-over-year price increases of 235% for anhydrous ammonia, 149% for urea, and 192% for liquid nitrogen (32% UAN):



Notes: Data reflect production costs for Iowa. Cash prices are not adjusted for inflation. Liquid nitrogen prices reflect prices for fertilizer containing 32 percent nitrogen.

Source: USDA, Economic Research Service using data from the USDA, Agricultural Marketing Service, 2022 Historical Data Iowa Costs of Production.

64. Defendants took lockstep price increases throughout 2021 and 2022. CF Industries reported in its 2022 Annual Report that average prices in its ammonia segment increased 87 percent, from $498 per ton in 2021 to $936 in 2022; average granular urea prices increased 45 percent, from $438 per ton in 2021 to $633 in 2022; average UAN prices increased 93 percent, from $272 per ton in 2021 to $526 in 2022; and average ammonium nitrate prices increased 78 percent from $297 per ton in 2021 to $530 in 2022.

65. Nutrien's price increases for Nitrogen fertilizers were very similar to those of CF Industries. Nutrien's average ammonia prices increased 104 percent year-over-year, from 2021 to 2022, from $477 per ton in 2021 to $973 in 2022; average urea prices increased 46 percent, from $478 per ton in 2021 to $696 in 2022; and average prices for "Solutions, nitrates and sulfates" increased 69 percent, from $238 per ton in 2021 to $402 in 2022.

66. Nutrien and Mosaic reported similar price increases for phosphate fertilizers. Nutrien reported a 34 percent year-over-year increase in average sales prices from 2021 to 2022 (from $602 per ton in 2021 to $806 in 2022), while Mosaic reported a 48 percent year-over-year increase over this time (from $618 per metric ton in 2021 to $913 in 2022).

67. Nutrien and Mosaic also reported similar price increases for potash fertilizers. Nutrien reported that its average prices for its "Manufactured product" increased 113 percent year-over-year, from $296/ton in 2021 to $630/ton in 2022. Mosaic's prices mirrored similar increases: for MOP, average prices increased 121 percent from $285/ton in 2021 to $632/ton in 2022; and for all finished products, by 94 percent, from $321/ton in 2021 to $643/ton in 2022.

68. While in 2023, prices declined somewhat from their 2022 highs, beginning in mid-2024, fertilizer prices across all three nutrient categories began rising again:




69. Repeating the lockstep price increases in previous years, Defendants' prices again rose in parallel from 2024-2025.

70. Nutrien's net selling prices rose across all major Nitrogen products from 2024 to 2025, including ammonia from approximately $410 to $422 per ton in 2025, urea from approximately $421 to $490, and "[s]olutions, nitrates and sulfates" from approximately $221 to $268. Nutrien's average net selling price across all of its Nitrogen products increased from approximately $324 per ton in 2024 to $365 per ton in 2025.

71. CF Industries reported similar price increases as Nutrien. In the full-year 2025, CF Industries reported an increase in average selling prices, from approximately $425 per ton for ammonia in 2024 to $473 in 2025, $354 per ton for granular urea in 2024 to $443 per ton in 2025, $248 per ton for UAN in 2024 to $311 in 2025, and $286 per ton for ammonium nitrate in 2024 to $317 per ton in 2025.

72. In February 2026, Mosaic reported that its sales price had increased on DAP, a Phosphate Fertilizer, by 14.5%, from $585 in 2024 to $670 in 2025. Around the same time, Nutrien reported a similar increase in Phosphate Fertilizer sales prices: from an average net selling price for the first three quarters of 2024 of $611 to $677 for the same period of 2025, representing a 10.8% increase.

73. Similarly, in February 2026, Nutrien reported that its North American Potash net selling price rose from approximately $270 per metric ton in the fourth quarter of 2024 to approximately $305 per metric ton in the fourth quarter of 2025—an increase of roughly 13 percent. Mosaic likewise reported in February 2026 that its realized Potash prices increased from approximately $199 per ton in the fourth quarter of 2024 to approximately $264 per ton in the fourth quarter of 2025, representing an increase of approximately 33%.

74. These increases cannot be explained by input costs or other economic factors. Nutrien's gross manufacturing profit margin increased 669% from 2020 to 2021, despite its costs of goods sold only increasing by only 58%. This dramatic expansion of profits continued into 2022, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF Industries by 212%.

75. As U.S. farmers and consumers paid higher prices for NPK Fertilizer, Manufacturer Defendants experienced record high profits:




76. The coordinated resumption of price increases across all three nutrient markets in 2024–2026, after the 2023 decline, replicates the same pattern observed during the 2021–2022 spike. This pattern of recurring, synchronized price movements across three chemically distinct product categories is more consistent with coordinated conduct than

with independent pricing decisions made by companies responding to different cost structures and supply-demand conditions.

77. Defendants' own statements emphasize that their price increases could not be explained as primarily resulting from increased input costs. For example, in May 2022, Nutrien reported increased profitability in its Nitrogen sector, which it attributed to "[h]igher net realized selling prices [that] more than offset higher natural gas costs." CF Industries Holdings similarly stated that its price increases were "due primarily to higher average selling prices partially offset by higher natural gas costs[.]"

78. The markets for three different types of fertilizer - nitrogen, phosphate, and potassium – are different in terms of their chemical products, production processes, raw material inputs, and in many cases their producers. In a competitive market, the prices of these distinct products would be driven by their respective cost structures and supply-demand fundamentals, producing differentiated price trajectories. Synchronization of prices and price increases across all three markets is anomalous in a competitive setting and is more consistent with coordinated conduct and collusion among Manufacturer Defendants who—uniquely in these markets—participate across multiple nutrient categories and maintain formal and informal mechanisms for the exchange of competitively sensitive information.

### D. Defendants also Coordinated Reductions in Production to Maintain High Prices.

79. During the Class Period, each Manufacturing Defendant also committed to restrict supply of NPK Fertilizer for sale in the United States, such as by limiting production, not building new plants or expanding existing ones, and/or running existing plants under capacity or idling them. These decisions were made despite high prices, high margins, and high demand for NPK Fertilizer, and clearly indicate a collusive effort to maintain supracompetitive prices through supply reduction.

80. If the NPK Fertilizer market had remained competitive, the extremely high prices and profit margins in 2021 and 2022 would have motivated a rapid effort to invest in new plants and expand existing ones. But the Manufacturing Defendants did the reverse: refusing to expand and running existing plants below capacity or idling them. This is not consistent with the behavior of independent firms in a competitive market, but instead is further evidence of collusion that would be economically irrational for any individual firm to do but that as a group collusively maintained artificial shortages to keep prices high.

81. Despite very high prices and margins, urea production rose only 2 percent from 2017 to 2021, phosphoric acid production rose just 7 percent over the same period, and global potash production fell 14 percent from 2021 to 2022.

### E. Other Factors Indicate Existence of a Conspiracy in the NPK Fertilizer Market

82. While collusion can occur in almost any industry, it is more likely to occur in some industries over others, and industry conditions can indicate when an industry is more susceptible to collusion and when certain indicators might be more likely to indicate actual collusion.

83. In antitrust law, "plus factors" are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and which are considered to support an inference of collusion.[10] Each plus factor that is present constitutes circumstantial evidence in favor of a finding of active collusion, as opposed to mere conscious parallelism (companies following their competitors' price increases in a competitive market without any actual agreement to collude or exchange of information).

84. In the NPK Fertilizer industry, there are multiple plus factors that support the plausible inference that Defendants are members of a per se unlawful price-fixing cartel. These include: (1) a concentrated market on the supply side; (2) standardized, homogenous commodity products; (3) high barriers to entry; (4) inelastic demand; (5) an unconcentrated market on the demand side; (6) Manufacturer Defendants' exchange of competitively sensitive information through IFA and TFI and other opportunities to collude; and (7) Manufacturer Defendants' history of anticompetitive conduct.

85. ***Concentrated supply-side market*:** High market concentration increases the likelihood of collusion and other anticompetitive practices. An industry in which a few companies dominate all or nearly all of the market as opposed to many companies with individually smaller market share allows for easier coordination of price increases, territorial allocation, and/or information sharing. Over time, Manufacturer Defendants can leverage the concentrated market to maintain supra-competitive prices. As mentioned, as

[10] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

of 2024, the Manufacturer Defendants controlled at least 82% of the nitrogen fertilizer market, 90 to 95% of the potash fertilizer market, and 91% of the phosphate fertilizer market in North America. Because the production of NPK Fertilizer is highly concentrated, with the Manufacturer Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[11]

86. ***Standardization*:** NPK Fertilizer is standardized because the nutrients in NPK Fertilizer are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.[12]

87. In other words, NPK Fertilizer is a fungible, homogenous commodity product with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based primarily on price.

88. ***High barriers to entry*:** There are also high barriers to entry for any new entrant to become a large and profitable producer of NPK Fertilizer. Those barriers include: (1) high fixed costs, (2) technically complex production processes, (3) significant

---

[11] *Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, Dep't of Just. – Antitrust Div. (Oct. 10, 2023), https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.").

[12] *Id.* ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.").

economies of scale in production, (4) extensive regulatory and logistical barriers, and (5) difficulty of accessing inputs.

89. High barriers to entry in an industry make it easier for dominant companies in that industry to collude and charge supracompetitive prices without fear of new entrants coming in and undercutting their prices.

90. ***Inelastic demand*****:** Demand for NPK Fertilizer is inelastic, as NPK Fertilizer is a practical necessity for farmers as part of the crop growing process, and as a result demand for NPK Fertilizer is highly price inelastic. NPK Fertilizer does not have reasonable substitutes, nor can farmers simply use less of it without significant adverse effects on crop yields. This makes it easier for the Manufacturer Defendants to collude and charge supracompetitive prices without farmers switching to another product or using less NPK Fertilizer. Industries with inelastic demand, such as the NPK Fertilizer industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

91. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizer cannot be reasonably substituted for other goods—although there are other types of fertilizer, NPK Fertilizer is unique because it provides precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making it distinct from other fertilizers, such as organic fertilizers, which do not have those advantages, or single-nutrient micronutrient fertilizers for copper, zinc, boron, etc., which can have specific roles for certain crops and soil conditions but do not have those generalized and widespread functions of NPK fertilizers. Customers similarly do not view NPK Fertilizer as interchangeable with other types of fertilizers.

92. As explained above, nitrogen, phosphorus, and potash fertilizers each have their own role in crop development, and they also cannot be reasonably substituted for one another. This also makes demand for NPK Fertilizer inelastic, since high prices for one nutrient will not lead to substitution towards another.

93. ***Unconcentrated demand-side market***: The high concentration of the Manufacturer Defendants on the supply side of the NPK Fertilizer market contrasts with the highly unconcentrated demand side, consisting of a very large number of individual farmers and farms who do not have the power to demand competitive pricing, negotiate price reductions, and confront collusive arrangements. The Manufacturer Defendants have little incentive to cheat on collusive pricing arrangements, since each potential sale to an individual farmer or farm is small in comparison to the benefits from the collusive pricing agreement.

94. ***Exchange of competitively sensitive information and other opportunities to collude***: Trade associations and business relationships make collusion easier.[13] The Manufacturing Defendants have frequent opportunities to collude and exchange confidential information through trade associations to which they belong and in which their executives serve as board members, as well as through other strategic partnerships.

95. First, as described above, Manufacturer Defendants Mosaic and Nutrien jointly own Canpotex. Canpotex is a Canadian export marketing agency through which

[13] *Id.* ("Collusion is more likely if the competitors know each other well, through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.").

Mosaic and Nutrien collectively sell their Canadian potash into overseas markets. Canpotex thus fosters a business relationship whereby Mosaic and Nutrien share a range of data that would normally not be shared with a competitor, including production data, pricing information, and sales volumes. Moreover, Mosaic and Nutrien employees display significant overlaps with those of Canpotex. Nutrien's CEO Kenneth Seitz was formerly the President and CEO of Canpotex, for instance.

96. Second, nearly all Defendants and co-conspirators named in this Complaint are members of IFA, including Defendants Nutrien, Nutrien Ag, Mosaic, Mosaic Fertilizer, CF Industries, KAES, KAS, Koch Fertilizer, Yara, Yara NA, Canpotex, and TFI. IFA's board of directors includes several executives of Manufacturer Defendants: Kenneth Seitz (Nutrien), Chris Bohn (CF Industries), Bruce Bodine (Mosaic), and Svein Tore Holsether (Yara).

97. IFA is the only global fertilizer association, with members at all levels of the fertilizer supply chain: fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations. The IFA's membership flyer includes the following descriptions of its work:[14]



**DATA & INTELLIGENCE**

IFASTAT is your go-to for global fertilizer data:

- 15+ years of supply, production & trade data
- 70 years of nutrient consumption insights
- Regular market analysis and outlooks
- Country profiles, nutrient efficiency stats, and more

**CONFERENCES & EVENTS**

IFA hosts top-tier global gatherings, including conferences and events:

- **Annual Conference** – Industry's flagship networking event
- **Cultivating Tomorrow** – Innovation meets sustainability
- Regional and thematic fora on markets, innovation, sustainability and more (Global Markets Conference, Crossroads Asia-Pacific Conference, Strategic Forum)

**DRIVING SUSTAINABILITY**

We provide:

- Production **certification, benchmarks** and **roadmaps**
- Safety, circular economy and decarbonization **initiatives**
- **Training** via the Sustainable Fertilizer Academy
- Awards recognizing excellence in safety, health and environment

[14] *IFA Membership Flyer*, International Fertilizer Association (June 30, 2025), https://www.fertilizer.org/resource/ifa-membership-flyer/

98. IFA members decide together on areas of common interest, joint actions and positions on emerging and complex issues facing the fertilizer industry today. IFA membership benefits include industry events and access to an industry data sharing platform, IFASTAT.

99. IFA boasts IFASTAT is the leading source of fertilizer and raw materials statistics in the world. Compiled by IFA's Market Intelligence team, IFASTAT contains comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption, including (i) 70 years of global fertilizer data, (ii) 15 plus years of supply, production & trade data, and (iii) regular market analysis. A key feature of IFASTAT data is its Market Outlook Reports. Only members may access the medium-term and short-term supply and demand detailed Market Outlook Reports, with the public limited to summaries of these reports.

100. IFA members also get access to exclusive events that facilitate the sharing of information, which enable collusion between the Manufacturing Defendants. One such event is the IFA Annual Conference, where all the key fertilizer players gather to network and learn about the latest developments in the industry. Additionally, IFA coordinates annual regional events to promote industry cooperation.

101. Third, Manufacturer Defendants Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic are all members of TFI, with TFI's board of directors including executives from various Manufacturer Defendants. As of April 2026, TFI board members included Bruce Bodine (Mosaic); Chris Bohn (CF Industries); Scott McGinn (Koch Fertilizer); Sabine Schröder (Yara NA); and Kenneth Seitz (Nutrien).

102. Besides offering members-only data sharing, TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference. Like IFA, TFI's shared data and regular member events enable collusion between Manufacturer Defendants.

103. Finally, Manufacturer Defendants are also members and hold leadership positions in the following additional organizations, associations, and groups: Fertilizer Canada; The Sulfur Institute; Fertilizer Industry Round Table; and Agricultural Retailers Association. Shared membership and leadership within these entities only further enables collusion.

104. ***History of anticompetitive conduct*:** Finally, the NPK Fertilizer industry has faced scrutiny for potential anticompetitive conduct in the past.

105. In the early 1990s, several potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.

106. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium (PotashCorp and Agrium merged to become Nutrien)—coordinated production and sales to keep potash prices artificially high. Plaintiffs alleged producers shared market information, allocated volumes, and restricted output in furtherance of the conspiracy. Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).

## V. RELEVANT ANTITRUST MARKET

107. Plaintiff is not required to plead a relevant market to establish liability under Section 1 of the Sherman Act where, as here, the alleged conduct constitutes a per se unlawful agreement between horizontal competitors to fix prices and/or restrict supply. Nevertheless, to the extent relevant markets are required, the markets for nitrogen fertilizer, phosphate fertilizer, and potash fertilizer described below constitute relevant antitrust markets in which Defendants' conduct restrained competition.

108. Nitrogen fertilizer, phosphate fertilizer, and potash fertilizer each constitute relevant antitrust product markets because each type of product supplies distinct, essential nutrients to plants that meet distinct agronomic needs. Nitrogen fertilizers promote leaf and stem growth and support rapid vegetative development. Phosphate fertilizers provide nutrients that plants use for energy transfer and root development, supporting early plant establishment and the formation of flowers and seeds. Potash fertilizers regulate water movement and enzyme activity in plants, improving stress tolerance, disease resistance, and overall crop quality. Because each type of fertilizer serves distinct needs in agriculture, they are not reasonably interchangeable with each other, with other types of fertilizer such as organic fertilizer or micronutrient fertilizer, or with other chemical products used in agriculture such as pesticides.

109. The relevant geographic market for nitrogen fertilizer, phosphate fertilizer, and potash fertilizer is the United States.

## VI. FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

110. Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover, and they could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for NPK Fertilizer.

111. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

112. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2026, when news of the DOJ's investigation into NPK Fertilizer prices broke.

113. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any applicable statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this Complaint.

114. Additionally, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued

to make sales of NPK Fertilizer impacted by Defendants' continually renewed and adjusted price-fixing and industry data exchange agreements.

115. Defendants' overt acts were new and independent acts that perpetuated their agreement. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to fully exploit market participants based on currently-existing conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

116. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of NPK Fertilizer by a Manufacturer Defendant constituted a new cause of action for purposes of the statute of limitations.

## VII. ANTITRUST INJURY AND DAMAGES

117. Defendants' anticompetitive conduct has had the following effects, among others:

a) The Manufacturer Defendants caused the price of NPK Fertilizer in the United States to be fixed at and raised to artificially high and supracompetitive levels;

b) Plaintiff and other direct purchasers of NPK Fertilizer have been deprived of free and open competition in the NPK Fertilizer market that would have resulted in prices being at a competitive level; and

c) Plaintiff and other direct purchasers of NPK Fertilizer have paid artificially inflated prices.

118. The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of NPK Fertilizer and, as a direct and foreseeable result, Plaintiff and the Class have paid supracompetitive prices for NPK Fertilizer during the Class Period.

119. By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury, having paid higher prices for NPK Fertilizer than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

120. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII. <u>ANTITRUST INJURY</u>

121. Beginning at least around January 1, 2020, and continuing until the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, Defendants sold substantial quantities of NPK Fertilizers in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where the Defendants produced their NPK Fertilizers.

122. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories. For example, in 2023, the United States consumed 20.13 million metric tons of fertilizer nutrients, nearly all of which

was NPK Fertilizer. Defendants own facilities in the United States that produce NPK Fertilizer, and sold NPK Fertilizer in the United States, affecting United States commerce.

123. Further, Defendants knew that their NPK Fertilizers would enter the United States stream of commerce and would affect United States commerce, including harm to Plaintiff and the proposed Class in the payment of supra-competitive prices for NPK Fertilizers.

124. To the extent any Defendant sold NPK Fertilizers from other countries into the United States, those sales constitute import commerce into the United States and Defendants' price-fixing had a substantial intended effect on United States import commerce by increasing the prices that direct purchasers, including Plaintiff and the proposed Class, paid for NPK Fertilizer.

125. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

126. Defendants' unlawful conduct described herein caused inflated prices for NPK Fertilizer in the United States, and within those States.

127. Defendants' unlawful conduct has had a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix and raise the prices of NPK Fertilizers sold in the United States, the price of NPK Fertilizers

would have been determined by a competitive market, and would have been substantially lower.

## IX. CLASS ACTION ALLEGATIONS

128. Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons and entities who purchased NPK Fertilizer directly from any of the Manufacturer Defendants or any of their co-conspirators in the United States at any time from January 1, 2020 until the effect of the Manufacturer Defendants' anticompetitive conduct ceases (the "Class Period").
>
> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

129. Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

130. <u>Numerosity</u>: Plaintiff does not know the exact number of class members because such information is presently in the exclusive control of the Defendants. According to the U.S. Department of Agriculture, there are approximately 3.4 million farmers in the United States, working across 1.9 million farms.[15] Plaintiff believes that the vast majority of

---

[15] *2022 Census of Agriculture, Farm Producers*, U.S. Dept. of Ag., Natl. Ag. Statistics Service (Feb. 2024),

those farms and farmers are purchasers of NPK Fertilizer, and a significant fraction purchase NPK Fertilizer directly from the Manufacturer Defendants. This would mean that there are likely to be hundreds of thousands of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

131. Typicality: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased NPK Fertilizer directly from one or more of the Manufacturer Defendants at supracompetitive prices resulting from their conduct and thereby experienced overcharges, and were damaged by the same common course of wrongful conduct as other Class Members.

132. Commonality: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual class members, including, but not limited to:

a) Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of NPK Fertilizer sold in interstate commerce in the United States in violation of federal antitrust laws;

b) Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c) Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the

https://www.nass.usda.gov/Publications/Highlights/2024/Census22_HL_FarmProducers_FINAL.pdf

United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

d) The identity of the participants of the alleged conspiracy;

e) The scope and duration of the alleged conspiracy;

f) The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

g) The effect of Defendants' alleged conspiracy on the prices of NPK Fertilizer sold in the United States during the Class Period;

h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

i) Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j) The appropriate class-wide measure of damages; and

k) Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

133. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

134. Predominance: Questions of law and fact common to Plaintiff and all members of the Class—including the legal and factual questions relating to Defendants' liability and the measure of damages described above—predominate over any questions affecting only individual members of the Class.

135. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

136. Injunctive Relief: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## X. CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act
### Section 4 and 16 of the Clayton Act
### (15 U.S.C. §§ 1, 3, 15(a), 26)

137. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2020, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for NPK Fertilizer in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

139. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2020, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for NPK Fertilizer in the United States. The agreement was intended to and did unreasonably restrain trade, and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the NPK Fertilizer market in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

140. Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market while

knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of NPK Fertilizer sold in the United States to Plaintiff and members of the Class.

141. Pursuant to the agreement, Defendants agreed to and did collectively act to restrict the supply of NPK Fertilizer in the United States, such as by limiting production, not building new plants or expanding existing ones, and/or running existing plants under capacity or idling them. These decisions were made despite high prices, high margins, and high demand for NPK Fertilizer, and clearly indicate a collusive effort to maintain supracompetitive prices through supply reduction, and which did restrict the supply of NPK Fertilizer in the United States and cause Plaintiff and members of the Class to pay supracompetitive prices for NPK Fertilizer.

142. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

143. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a) Price competition in the sale of NPK Fertilizer in the United States has been restrained, suppressed, and/or eliminated;

b) Prices for NPK Fertilizer in the United States been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c) Those who purchased NPK Fertilizer directly from the Manufacturer Defendants have had to pay supracompetitive prices relative to the prices that would have existed had there been free and open competition.

144. Plaintiff and Class Members have been injured and will continue to be injured in their businesses and property by paying more for NPK Fertilizer purchased directly from the Manufacturer Defendants than they would have paid in the absence of the contract, combination, or conspiracy.

145. Plaintiff and Class Members are entitled to damages, treble damages, and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## XI. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests judgment against Defendants, as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

C. That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F. That Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G. That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H. That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XII. DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

## XIII. DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. L.R. 40.2, Plaintiff hereby requests Wichita, Kansas as the place for trial.

Dated: July 15, 2026

By: /s/*Eric D. Barton*
Tyler W. Hudson (KS #20293)
Eric D. Barton (KS #16503)
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Ave. Ste. 300
Kansas City, MO 64112
Phone: (816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com

John Radice (*pro hac vice forthcoming*)
Daniel Rubenstein (*pro hac vice forthcoming*)
Kenneth Walsh (*pro hac vice forthcoming*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Phone: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com
kwalsh@radicelawfirm.com

***Counsel for Plaintiff and the Proposed Class***